UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBERTO REYES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:22-cv-00206-JPH-MG |
| | ) |
| DENIS MCDONOUGH Secretary, | ) |
| | ) |
| Defendant. | ) |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Roberto Reyes, claims that he was subjected to a hostile work environment because of his race while employed by the U.S. Department of Veterans Affairs (VA). He also alleges that his superiors retaliated against him for complaining about racist language and jokes. Defendant, Secretary of Veterans Affairs Denis McDonough, has filed a motion for summary judgment. Dkt. [40]. For the reasons below, that motion is **GRANTED.**

**I.
Facts and Background**

Because Defendant has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

**A. Background**

Mr. Reyes, an Afro-Puerto Rican/Black male, was hired on a conditional basis in April 2020 by the VA as a police officer at the Richard L. Roudebush VA Medical Center in Indianapolis, Indiana. Dkt. 1 at 1 (Plaintiff's Complaint,

1

describing Plaintiff as "an Afro-Puerto Rican/Black male"); dkt. 40-1 at 35–37 (Reyes Dep. 35:14–37:20); dkt. 40-5 at 1.  Newly hired officers must complete training at the VA Law Enforcement Training Center and a background investigation before they can receive law enforcement credentials and carry a firearm, badge, and police identification.  Dkt. 40-1 at 56, 136–137.  Mr. Reyes's employment with the VA was therefore conditional—with limited duties and assignments—pending completion of the required training and background investigation.  *Id.* at 36.

The VA assigned Mr. Reyes to a group of new officers led by Sergeant Nathan Hawley, who reported to Lieutenant Brian Moucha.  *Id.* at 62–63, 86, 89–90.  Mr. Reyes described sergeants as "mediators" between officers and the lieutenants, and that they were "there to be a buffer."  *Id.*  Mr. Reyes completed training at the Law Enforcement Training Center in October 2020, but did not receive his credentials at that time because his background investigation remained pending.  Dkt. 40-1 at 135; dkt. 40-3 at 1.

**B. Interactions with Sgt. Hawley**

Mr. Reyes testified that he heard "racist tendencies coming from Sergeant Hawley" and that other officers told him to stay away from Sgt. Hawley because he was known to be a racist.  Dkt. 40-1 at 231–32.  Mr. Reyes heard Sgt. Hawley make jokes about Jewish people and make statements about how black employees feel about police officers.  Dkt. 40-1 at 231.  Specifically, Sgt. Hawley "made some silly sheriff's hat or something like that for another officer and it had the Star of David, and he made some joke about the star of David."

2

*Id.* at 79. Mr. Reyes couldn't remember any more details. *Id.* He also overheard Sgt. Hawley make comments like "oh the black employees don't like the police at the hospital" in a group setting, and not directly to Mr. Reyes. *Id.* at 103.

On November 19, 2020, while on duty with Sgt. Hawley, Mr. Reyes overheard a video that Sgt. Hawley was watching on his phone that included use of the "'N' word." *Id.* at 106–07. Sgt. Hawley quickly stopped the video and explained to Mr. Reyes that the video was from a friend on a social media app, Snapchat, and that he could not control whether that language would be used on his friend's account. Dkt. 40-8 at 2. The video offended Mr. Reyes. *Id.* Lt. Moucha later informed Mr. Reyes that he had spoken with Sgt. Hawley about the incident and had instructed Sgt. Hawley to be more careful with his internet browsing while at work. *Id.*

On December 5, 2021, Mr. Reyes submitted a complaint to Captain Gregory Kafer about the Snapchat video incident. Dkt. 40-8. And on January 23, 2021, Mr. Reyes filed a Complaint of Employment Discrimination with the VA Equal Employment Office describing the Snapchat incident. Dkt. 40-11. At that time, Mr. Reyes had still not received his law enforcement credentials. *Id.* at 5. Mr. Reyes stated in his complaint that the delay was intentionally caused by his superiors because he had made a formal complaint against Sgt. Hawley. *Id.*

## C. Transfer and Incidents while on Night Shift

Shortly after he returned to Roudebush from law enforcement training, Mr. Reyes requested a transfer to the night shift. Dkt. 40-1 at 128. The request was approved, and Mr. Reyes began working the night shift in the same uncredentialed role. *Id.* His lead officer was Sgt. Anthony Duchene and his direct supervisor was Lieutenant Thomas Wininger. *Id.* at 29; 128; Dkt. 40-12 at 1.

On January 29, 2021, Mr. Reyes and Sgt. Duchene argued about the pervasiveness of cheating in college. Dkt. 40-1 at 145; dkt. 40-12 at 1. Sgt. Duchene expressed his belief that "pretty much everyone cheats in college," and Mr. Reyes responded that he had multiple degrees and did not cheat to get them. Dkt. 40-1 at 145. Sgt. Duchene became upset and defensive and accused Mr. Reyes of cheating. *Id.* Mr. Reyes testified that this was the first time Sgt. Duchene "had a problem with [him]." *Id.* at 146.

The next day, Mr. Reyes was assigned to work in the Roudebush atrium. Dkt. 40-12 at 1. A few minutes into his shift, Sgt. Duchene arrived and gave Mr. Reyes the option to patrol the exterior portion of Roudebush with instructions to advise uniformed officers if he observed anything suspicious. *Id.* Mr. Reyes responded that he did not feel comfortable leaving his interior patrol because he was unarmed and unable to defend himself if a dangerous situation arose. *Id.* Sgt. Duchene became angry and said "What, are you scared?" Dkt. 40-1 at 256, 149; dkt. 40-12 at 1. He then stated to Mr. Reyes, "I know you! I know what the Department is saying about you! I know what the

4

Chief is saying about you! I know what Capt. Kafer is saying about you! And, you're bucking the system! And, at this point, I know you lied on your background, which is why you're here!" Dkt. 40-1 at 256, 149; dkt. 40-12 at 2.

On January 31, 2021, Mr. Reyes reported his concerns with Sgt. Duchene's comments and behavior to Lt. Wininger. Dkt. 40-12 at 2. Lt. Wininger told Mr. Reyes that he had already spoken to Sgt. Duchene and that he intended to speak further with him about it. *Id.*

Following the January 30 incident with Sgt. Duchene, Mr. Reyes reported eight instances between February 1, 2021, and April 20, 2021, when Sgt. Duchene was either absent or left in the middle of a shift. *Id.* at 2–3. Mr. Reyes believed that Sgt. Duchene's absence on these occasions exposed him to a safety risk because Mr. Reyes was left unarmed without an armed officer backing him up. *Id.* at 3. Mr. Reyes told Lt. Wininger about Sgt. Duchene's absences. Dkt. 40-1 at 162.

While on the night shift. Mr. Reyes was involved in the following incidents:

- On March 28, 2021, Mr. Reyes accompanied Officer Jasen Sumner on a security check of Crown Hill Cemetery. Dkt. 40-14 at 1. Mr. Reyes had patrolled Crown Hill Cemetery multiple times and had agreed to go because Lt. Wininger "promoted that kind of thing." Dkt. 40-1 at 164–65. As Mr. Reyes and Officer Sumner patrolled, a car passed by the cemetery, and Mr. Reyes and Officer Sumner saw and heard gunfire from the car. *Id.* at 169. Mr. Reyes immediately dropped to

5

the ground. Dkt. 40-14 at 2. Neither Mr. Reyes nor Officer Sumner were injured. *Id.*

- On April 20, 2021, Mr. Reyes encountered a man at the hospital emergency room who refused to provide identification. Dkt. 40-13. Mr. Reyes told a dispatcher that he was confronting the man. *Id.* Sgt. Duchene also reported to the dispatcher that he was in the vicinity of the incident but did not go to the location. *Id.* Instead, Lt. Wininger arrived, and he and Mr. Reyes escorted the man out of the hospital. *Id.*

- Mr. Reyes confronted a veteran who swung at him with a closed fist. Dkt. 40-1 at 258. No credentialed officers were involved in that confrontation. *Id.*

- Mr. Reyes responded to a call on a mental health patient who was combative with Roudebush staff. *Id.* at 260–61. Lt. Wininger and Officer Sumner also responded to that call. *Id.* Mr. Reyes testified that Lt. Wininger's instructions to him were to respond to dispatches along with other officers on duty. *Id.* at 259–60.

**D. Termination and this Lawsuit**

On June 30, 2021, the U.S. Office of Personnel Management ("OPM") sent a letter to Mr. Reyes informing him that his background investigation raised "a serious question of [his] current suitability" for employment as a Police Officer with the VA. Dkt. 40-3 at 1. The OPM found that Mr. Reyes had failed to disclose formal complaints and allegations of misconduct against him while

6

employed by the Lexington Police Department that had resulted in the termination of his employment. *Id.* at 4–15. The OPM found that Mr. Reyes had been suspended for three months by the Lexington Police Department following a complaint that he used his taser improperly against multiple people who were not a threat to him or other officers and had yelled at them for several minutes. *Id.* 18. OPM also found that Mr. Reyes had left his employment with another employer due to performance deficiencies. *Id* at 4–12.

OPM provided Mr. Reyes with an opportunity to respond to and contest the accusation that he failed to disclose these events in response to questions during the application and background investigation process, dkt. 40-3 at 2, and Mr. Reyes did so, dkt. 40-20. On December 14, 2021, OPM issued a final decision requiring the VA to remove Mr. Reyes from federal employment. Dkt. 40-21 at 1.

Mr. Reyes filed this action against Denis McDonough as the Secretary of Veterans Affairs and against the Department of Veterans Affairs, asserting six claims. Dkt. 1. By agreement of the parties, Counts II, IV, and VI of the Complaint were dismissed, and the VA was dismissed as a defendant. The remaining claims that are set forth in Counts I (termination because of race), III (hostile environment based on race), and V (retaliation), name Secretary McDonough as the only Defendant. Dkt. 20. The Secretary has moved for summary judgment. Dkt. 40.

7

## II.
## Applicable Law

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

## III.
## Analysis

Mr. Reyes's complaint includes claims of race discrimination, a hostile work environment, and retaliation against Secretary McDonough under Title VII. 42 U.S.C. § 2000e et. seq. Dkt. 1 at 5. The Secretary argues that he is entitled to summary judgment on all claims.

### A. Race Discrimination

The Secretary argues that he is entitled to summary judgment on Mr. Reyes's claim that he was terminated because of his race. Dkt. 41 at 17–20. Mr. Reyes did not respond, *see* dkt. 42. He therefore has "abandoned [this]

claim" and may no longer pursue it.  *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008).  Summary judgment is therefore **granted** on Count I, race discrimination.

## B. Hostile Work Environment

Mr. Reyes argues that he was subjected to a hostile work environment by Sgts. Hawley and Duchene, and that Lt. Wininger failed to take corrective action with respect to Sgt. Hawley.

Title VII prohibits employers from discriminating against employees based on race.  42 U.S.C. § 2000e-2(a).  This prohibition includes protection from a hostile work environment—"[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022).  To succeed on a race-based hostile work environment claim, the plaintiff must prove: "(1) he was subject to unwelcome harassment; (2) the harassment was based on race; . . . (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability."  *Gates v. Bd. of Educ. of the City of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019). "To [prove the second element], the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose."  *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

To prove the third element, a plaintiff must show that the discriminatory conduct was severe or pervasive considering the totality of the circumstances. *Scaife,* 49 F.4th at 1115. This includes "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim." *Id.*

Mr. Reyes must prove all four elements to make out a hostile work environment claim. *Id.* Mr. Reyes has shown the complained-of conduct was unwelcome, as he reported these incidents to supervisors. *See* dkt. 42 at 8. The Court therefore begins its analysis with the second and third elements—whether the harassment was race-based and severe or pervasive.

### 1. Mr. Hawley

In support of his hostile environment claim, Mr. Reyes designates evidence that Sgt. Hawley made "racist comments in Mr. Reyes's presence about Jews and Black people" and that he "played a racist Snapchat video while Reyes was in his presence." Dkt. 42 at 12. He further testified that Sgt. Duchene "heard Sergeant Hawley say racist comments about Mr. Reyes in the locker room, and to dispatch." Dkt. 42 at 12.

When evaluated in context under the totality of the circumstances, this conduct was not severe or pervasive to a degree that it altered Mr. Reyes's conditions of employment and created a hostile or abusive work environment. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist*

10

*Church*, 733 F.3d 722, 729 (7th Cir. 2013) (acknowledging single instances of behavior can give rise to Title VII liability but requiring a high level of severity); *E.E.O.C. v. Village at Hamilton Pointe LLC*, No. 22-2806, 2024 WL 2074326, *4 (7th Cir. May 9, 2024) (noting the "more remote or indirect the act[,] . . . the more attenuated the inference" that it effected the conditions of the plaintiff's workplace and that harassment directed at someone other than the plaintiff has a lower "impact" on them).

To be sure, the Snapchat video that Mr. Reyes overheard was inappropriate, offensive, and has a racial connection. But the speaker who used the racial epithet was a person on the video, not Sgt. Hawley. And even viewing the evidence most favorably to Mr. Reyes, it's clear that Sgt. Hawley did not intend for Mr. Reyes to hear it. The comment was not directed at Mr. Reyes or any other employee, and thus carries little weight when determining severity or pervasiveness. *See Hamilton Pointe*, 2024 WL 2074326, at *4 (describing three categories of racially charged language by supervisors—direct comments (which weigh heavier), comments made to non-plaintiffs (which carry less weight), and comments plaintiffs are told supervisors made (weakest evidence)). Mr. Reyes said that "[a]s soon as [Sgt. Hawley] played it . . . and that word came up or that phrase came up, [Sgt. Hawley] shut it off." Dkt. 40-1 at 110. Later, Sgt. Hawley told Mr. Reyes that he can't control what was on his friend's Snapchat account and that he was sorry. *Id.* at 117. Even accepting Mr. Reyes's view that Sgt. Hawley's apology wasn't sincere, this isolated incident isn't sufficient to show a hostile work environment. *See Scaife*, 49 F.4th at

11

1116 (plaintiff learning from coworker that another employee had called her a "stupid f****** n*****" did not qualify as sufficiently severe or pervasive even though a "one-time use of the n-word can in some circumstances warrant Title VII liability."); *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) ("[O]ne utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability. . . . [Plaintiff] presents no evidence that he was subjected to this type of offensive conduct more than once.").

 The same is true of Sgt. Hawley's comment, "oh the black employees don't like the police at the hospital." Dkt. 40-1 at 103. Even considering this comment along with the Snapchat video incident, they do not collectively amount to the type of severe or pervasive conduct from which a jury could reasonably find in Mr. Reyes's favor. *See Poullard v. McDonald*, 829 F.3d 844, 859 (7th Cir. 2016) (considering three "arguably race-tinged remarks" alongside other decidedly non-racial incidents and concluding that the alleged harassment was not severe or pervasive enough to rise to the level of a hostile work environment).

 Mr. Reyes's reliance on *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887 (7th Cir. 2018) is misplaced. There, the Seventh Circuit reversed the district court's grant of summary judgment on a hostile work environment claim because plaintiffs' supervisor used numerous racial epithets and made multiple derogatory racial remarks, including the N-word, speaking "using stereotypical African-American slang," and saying that one plaintiff "cleaned

12

like a monkey." *Id.* at 901–02 (listing all of the comments). Here, Mr. Reyes designates evidence of two incidents involving Sgt. Hawley—the Snapchat video and the comment about black employees not liking the police. These incidents were not as numerous or severe as the incidents in *Johnson*.

Finally, Mr. Reyes argues that Sgt. Hawley made racist comments about him to others. Dkt. 42 at 15–17. But when asked for details, Mr. Reyes said he didn't have any more information, only that Sgt. Duchene told him that Sgt. Hawley said "racist things" about him. Dkt. 40-1 at 124-27. Such conclusory and vague statements—made only to other people and not to or even in the presence of Mr. Reyes—is the "weakest evidence" or "hearsay," *Johnson*, 892 F.3d at 902, and therefore insufficient evidence from which a jury could find for Mr. Reyes. *See Hamilton Pointe*, 2024 WL 2074326, at *4 (describing the categories of racially charged language in the context of hostile work environment claims).

Perhaps because there's scant evidence showing that Sgt. Hawley's conduct created a hostile work environment, Mr. Reyes repeatedly cites to the same facts—the Snapchat video, the comment about black employees not liking the police, and the "racist things" that Sgt. Hawley allegedly said to Sgt. Duchene. *See* dkt. 42 at 2; 12; 13; 15; dkt. 40-1 at 107–108. But no matter how many times he refers to them, these events are not sufficient for a jury to reasonably conclude that Sgt. Hawley's conduct was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment. *See Passanati v. Cook Cnty.*, 689 F.3d 655, 667

13

(7th Cir. 2012) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that that alters the terms and conditions of employment.").

### 2. Mr. Duchene

In support of his hostile environment claim, Mr. Reyes designates instances when Sgt. Duchene left Mr. Reyes alone and unarmed in the atrium of the VA Hospital. Dkt. 42 at 9. He also argues that Sgt. Duchene subjected him to racial harassment when he said that Mr. Reyes was "bucking the system" and had discussions with him about cheating in college. Dkt. 42 at 10.

Mr. Reyes designates no evidence, however, that any of these incidents had a racial character or purpose. Even assuming that Mr. Reyes was put in some degree of peril when Sgt. Duchene left him alone in the Atrium, there is no designated evidence from which a jury could reasonably find that Sgt. Duchene's actions that led to those situations—not showing up to work or leaving work early—had a racial character or purpose, or any discernable purpose for that matter. *See Yancick*, 653 F.3d at 549 ("Because we conclude that [plaintiff] hasn't presented facts upon which a reasonable jury could find that [the acts occurred] because of race, his claim fails as a matter of law."); *see also Liberty Mut. Fire Ins. Co. v. Clayton*, 33 F.4th 442, 447 (7th Cir. 2022) ("Although we construe facts in the light most favorable to the non-moving party, . . . we need only draw 'reasonable' inferences from the record."). The same is true regarding Sgt. Duchene's comments about Mr. Reyes "bucking the

14

system" and the prevalence of cheating in college. *Id.* Mr. Reyes's subjective belief that Sgt. Duchene's conduct and comments were related to his race does not make it so. *See Yancick*, 653 F.3d at 548–49 ("If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed.").

Last, Mr. Reyes argues that Sgt. Duchene created a hostile work environment by having "conversations with Reyes and inform[ing] him that Hawley was making racial complaints and they were directed toward Reyes." Dkt. 42 at 10. As explained above, Mr. Reyes designates no further details regarding what Sgt. Hawley said to Sgt. Duchene that was racial, dkt. 40-1 at 124-27, so it's insufficient. Similarly, Mr. Reyes designates no evidence from which a jury could find that Sgt. Duchene's informing him of Sgt. Hawley's comments was severe or pervasive to a degree that it altered Mr. Reyes's conditions of employment and created a hostile or abusive work environment.

Mr. Reyes has not designated evidence showing that the conduct of Sgts. Duchene and Hawley, whether considered alone or collectively, created a hostile work environment based on race. *See Gates*, 916 F.3d at 636 (listing elements of a hostile work environment claim). Therefore, no reasonable juror could find that Mr. Reyes's workplace was "so pervaded by discrimination that the terms and conditions of employment were altered." *Demkovich*, 3 F.4th at

15

977. The Secretary is **GRANTED** summary judgment on Mr. Reyes's hostile environment claims.[1]

**C. Retaliation**

Title VII prohibits employers from retaliating against employees for engaging in protected behavior, including bringing a complaint of race discrimination. *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). For a retaliation claim, a plaintiff must show "(i) [he] engaged in activity protected under Title VII; (ii) [he] suffered an adverse employment action; and (iii) [his] protected activity and the adverse action(s) were causally connected." *Runkel v. City of Springfield*, 51 F.4th 736, 746 (7th Cir. 2022). "For a retaliation claim, an adverse employment action is that which would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Giese v. City of Kankakee*, 71 F.4th 582, 590 (7th Cir. 2023) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). While the standard to demonstrate an adverse employment action in a retaliation claim is less than in Title VII discrimination claim, *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833 n.3 (7th Cir. 2015), "it is important to separate significant from trivial harms". *Lewis v. Wilkie*, 909 F.3d 858, 867–68 (7th Cir. 2018) (employees are not protected against "petty slights and minor annoyances that often take place at work and that all employees experience").

---

[1] Having found that Mr. Reyes has not designated evidence from which a jury could find that he was subjected to a hostile work environment by Sgt. Duchene and/or Sgt. Hawley, the Court need not address Mr. Reyes's argument that "Lieutenant Wininger failed to take appropriate remedial action reasonably calculated to the harassment." Dkt. 42 at 18.

Here, the Secretary contends that the VA's actions were not adverse employment actions. Dkt. 41 at 26. Mr. Reyes does not contend that his termination following the discovery of untrue statements in his application constituted a retaliatory adverse action. *See* dkt. 42. Instead, he argues that he was subjected to adverse employment actions when (1) Sgt. Duchene did not arrive for his shifts, leaving Mr. Reyes alone and unarmed, and (2) when he was required to patrol Crown Hill cemetery without credentials. Dkt. 42 at 21–23.

Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Lewis*, 909 F.3d at 868. Here, Mr. Reyes has not designated evidence showing that he was injured or harmed by patrolling alone, or that patrolling alone was dangerous enough to constitute a materially adverse employment action. *But see Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 909, 911 (7th Cir. 2022) (finding a dangerous assignment to be retaliatory where the employee was assigned solo work that was dangerous if done alone); *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (finding retaliation when a supervisor directed plaintiff-police officer to "more dangerous assignments via the police radio after her discrimination claims"). The district court in *Lewis* described these dangerous incidents as including: assigning plaintiff to investigate a citizen complaint by herself, assigning her to a "shots fired" call, assigning her to partners she believed were dangerous, and being reassigned from an in-progress burglary call to a more

17

dangerous assignment. *Lewis v. City of Chicago*, 563 F. Supp. 2d 905, 918 (N.D. Ill. 2008).

Here, Mr. Reyes's most dangerous assignment and encounters were far less dangerous than those in *Lewis*. On one occasion he blocked a punch from a "combative veteran," *id.* at 258, but this was in response to a call from a nurse in the atrium of the facility. Also, the instance where Mr. Reyes had to "confront a disgruntle[d] civilian by himself," Lt. Wininger showed up to assist. Dkt. 42 at 22; dkt. 40-1 at 254–55. There is no evidence Mr. Reyes was singled out for these assignments or deliberately sent into situations where one unarmed officer was clearly disproportionate to the level of danger presented. Similarly, Sgt. Duchene's failure to show up to a shift change is a "minor annoyance" that does not rise to the level of a materially adverse action. Mr. Reyes has not shown his working alone carried any danger greater than he would ordinarily face as a non-credentialled officer. The remaining allegations relating to instances when Mr. Reyes worked alone because Sgt. Duchene was late or failed to show up were similarly insufficiently dangerous to constitute an adverse employment action.

The second identified incident—patrolling Crown Hill Cemetery without credentials—was not an adverse employment action. Mr. Reyes admitted that going to Crown Hill was not required but was a voluntary decision he made because it was something that Lt. Wininger "promoted." Dkt. 40-1 at 165–67. Mr. Reyes has not produced evidence that could lead a reasonable juror to conclude the patrol assignment carried any danger greater than he would

18

ordinarily face as a non-credentialled officer. No juror could reasonably conclude from the designated evidence that patrolling Crown Hill Cemetery with another officer was an adverse employment action.

Finally, even if any of the incidents identified by Mr. Reyes constituted an adverse employment action, the Secretary is nonetheless entitled to summary judgment because Mr. Reyes has not designated evidence of a causal connection between the employment action and protected activity. *See Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022) (requiring a showing that retaliation "plays a part in a federal employment decision" in retaliation cases against a federal defendant). Mr. Reyes has not shown that either his work assignments or Sgt. Duchene's failure to show up for work was connected to his protected activity.

For these reasons, the Secretary is entitled to summary judgment on Mr. Reyes's retaliation claim.

## IV.
## Conclusion

Defendant's motion for summary judgment is **GRANTED**. Dkt. [40]. Final judgment will issue in a separate entry.

**SO ORDERED.**

Date: 5/17/2024

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel